IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| INGE GOODSON, ) | |
|     Plaintiff, ) | Case No. 1:12-cv-65 |
| ) | Judge Sharp |
| v. ) | Magistrate Judge Knowles |
| ) | |
| BANK OF AMERICA, N.A. ) | |
|     Defendant. ) | |

**PLAINTIFF'S COUNTERSTATEMENT OF FACTS AND RESPONSE
TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS (Dkt. #22)**

Plaintiff Inge Goodson (Goodson) hereby provides her counterstatement of material facts ("CSF #___") and responds to Defendant Bank of America, N.A.'s (BANA) "Statement of Material Facts" ("SMF __") (Dkt. 22) which show summary judgment is improper in this case.[1]

**Counterstatement of Material Facts (CSF)**

1. Goodson refinanced her home in 2008 with Taylor Bean & Whitaker (TBW), and she signed a note and deed of trust. *See* SMF #1 and 2, below.

2. TBW included Goodson's loan in a mortgage-backed security (MBS) issued by Government National Mortgage Association (Ginnie Mae) in April 2008. Exhibit M (Ginnie Mae Dep. at 12:12-14:6; 24:20-25:8; 31:15-32:22; 42:16-45:22 and Exhibits at Ex. 3, 4).

---

[1] BAC Home Loan Servicing LP ("BACHLS") merged into Bank of America, N.A. in July 2011. We refer to BANA as covering both entities, unless the context specifically indicates otherwise.
    To assist the Court, Plaintiff will reply on BANA's filings of depositions rather than filing copies of the same depositions. Plaintiff identifies the depositions by the name of the deposition and deposition page, and attempts to pinpoint the testimony by the docket number and page. Plaintiff also files her exhibits continuing the lettering from Defendant's filing, which ended on Exhibit L. So, Plaintiff's initial exhibit is "Exhibit M."
    This filing also assumes the Court's familiarity with facts as stated in the related case of *Goodson v. Shapiro & Kirsch, LP*, 1:11-cv-31 (M.D. Tenn.) which Plaintiff contends should be consolidated with this case for trial in September, given the significant overlap of facts and issues.

3. Ginnie Mae acts as a guarantor for payment of principle and interest on the loans comprising the MBS. See Ex. M (Ginnie Mae Dep. at 15:1-6).

4. The MBS is a trust, and the trust owns the mortgages in the pool comprising the MBS upon issuance of the security. Ex. M (Ginnie Mae Dep.at 27:4-29:18; 31:10-14).

5. The debt from the mortgages included within the MBS, which included Goodson's mortgage loan debt, is owed to the MBS. *Id.* (Ginnie Mae Dep. 44:2-18).

6. The Federal Reserve Bank of New York was the holder of the MBS that included Goodson's loan. *Id.* (Ginnie Mae Dep. 15:7-10 and Ginnie Mae Dep. Ex. 3, 4). So, the Federal Reserve Bank of New York was the entity to whom Goodson's debt was owed through July 2010. See Ex. M (Ginnie Mae Dep. 68:5-11).

7. Ginnie Mae defaulted TBW on August 4, 2009. Exhibit M (Ginnie Mae Dep. 50:12-54:18 and Ginnie Mae Dep. Ex. 5).

8. The default of TBW by Ginnie Mae extinguished all rights TBW had to the note, including any right to foreclose. Exhibit M (Ginnie Mae Dep. 51:1-52:16).

9. BANA had no involvement with Goodson's loan, and did not own the loan or hold the note, prior to allegedly taking over servicing of the loan in August 2009. *See* Exhibit N (BofA Dep. at 23:16-24:3).

10. Goodson's loan was in default when BANA began servicing Goodson's loan. Exhibit N (BofA Dep. at 24:4-21). Indeed, Bank of America acknowledged Goodson's loan was "in foreclosure" prior to Bank of America becoming involved with her loan. Exhibit O.

11. BANA sent Goodson a letter dated August 23, 2009, identifying Ginnie Mae as the creditor on her loan. Exhibit N (BofA Dep. at 26:10-28:1 and BofA Ex. 89).

2

12. BANA testified that it was attempting to collect payments on Goodson's loan for Ginnie Mae. Exhibit N (BofA dep. at 59:12-20 ("Q. The payments, if any, BAC collects, is it supposed to go – who is it supposed to go to? A. What do you mean by that statement? The homeowner is supposed to make the payments to BAC Home Loans Servicing. A. All right. <u>And if the homeowner makes those payments, where do the payments go? A. If she were making payments, they would be sent to Ginnie Mae</u>.") (emphasis added).

13. Shapiro & Kirsch, LLP, BANA's lawyers, received information that serving rights to the loan transferred to BANA, after Goodson's loan was in default and after TBW's bankruptcy. *See* Ex. P (S&K Dep. 45:17-23; 36:3-38:3).

14. S&K then was provided information from BANA to foreclose in the name of BANA. Ex. P (S&K Dep. 76:21-25).

15. There were no specific communications at this time that BANA owned and held the debt. *See id*. (S&K Dep. 63:25-78:15 and corresponding exhibits with that testimony). BANA did not own the debt at this time. *See* CSF #24.

16. Goodson's loan was bought out of the mortgage back security pool by Bank of America on behalf of Ginnie Mae, and Ginnie Mae owned the loan at that point, which was some unspecified date in July 2010. Ex. M (Ginnie Mae Dep. 55:11-15; 58:19-60:17; 66:7-67:3).

17. After 2010, when Ginnie Mae purchased Goodson's loan out of the pool and became the owner of the loan, Ginnie Mae became the entity owed the debt. *Id.* (Ginnie Mae Dep. 68:9-11).

18. S&K sent Goodson a May 6, 2010 letter that stated BANA was the creditor on Goodson's loan. SMF #6, Ex. E.

19. BANA was not the creditor on Goodson's note as of May 6, 2010, because the debt was owed to the MBS. CSF #3-6.

20. BANA obtained rights to Goodson's debt after that debt was in default and for the purpose of collecting that debt for Ginnie Mae or others. *See* CSF #9-12.

21. Goodson received letters from S&K dated July 6, 2010. See Exhibit Q; Exhibit P (S&K Dep. at Ex. 31, Answer to RFA #3 and Ex. B to RFA). The "Substitute Trustee's Sale" indicates: "Owner of Debt: BAC Homes Loans Servicing, LP FKA Countrywide Home Loans Servicing LP." *Id.*

22. BAC Homes Loans Servicing, LP FKA Countrywide Home Loans Servicing LP did not own Goodson's debt as of July 6, 2010. *See* CSF #2-12, 16-17, above.

23. S&K prepared and filed in the county land records a purported "Substitution of Trustee" document signed by BANA that BANA is the "owner and holder" of Goodson's debt. Exhibit P (S&K Depo. at Ex. 31, Answer to RFA #17 and Ex. D to RFA).

24. BANA did no "own and hold" Goodson's debt at the time BANA signed that document. Exhibit N.

25. S&K on August 8, 2010, sent Goodson a letter stating that her property had been sold at foreclosure sale. Exhibit R; Exhibit P (S&K Dep. Ex. 27).

26. S&K testified that the property was a "dead credit bid" whereby no money was paid, but that Goodson's loan should be reflected as paid in full. Exhibit P (S&K Dep. 115:15-116:10).

27. S&K executed two substitute trustee deeds, one dated August 3, 2010 (Exhibit P, S&K Dep. Ex. 65), and the other dated May 19, 2011 (Exhibit P, S&K Dep. Ex. 64); Exhibit P (S&K Dep. at 116:3-10; 127:7-22; 129:5-131:23). Both deeds say S&K offered the property for

4

sale at public outcry "for the highest bidder for cash" and that BAC bought the property for $260,643.41. (Exhibit P, S&K Dep. Ex. 64, 65).

28. S&K filed for a detainer summons against Goodson on behalf of its client BANA. Exhibit P (S&K Dep. Exh. at Ex. 24). The filing stated the property was sold at foreclosure on August 3, 2010. *Id.* Judgment was granted to BANA, Exhibit S, but Goodson appealed.

29. In subsequently filing for summary judgment, S&K filed an affidavit on behalf os its client BANA in state court attesting that "the property was sold to [BAC] for $260,643.41" and filed the substitute trustee deed indicating that the purchase was in cash. *See* Exhibit T.

30. Around July 1, 2011, BANA sent Goodson a notice indicating that she still owed a debt. SMF #1, below; Exhibit N (BofA Dep. and Ex. 91). That notice indicated Goodson still owed $278,681.40 on her note and that the creditor was "GMNA-MSS-TBW 9262 AA." *Id.*

31. Goodson requested verification, and BANA responded via its counsel. SMF #13-14; Exhibit N (BofA Dep. and Ex. 94). That letter stated that the current owner of the note is Ginnie Mae. *Id.* That letter also enclosed a payment history. *Id.* That payment history showed no credit or payment related to the supposed purchase by BANA at foreclosure of Goodson's property. *Id.*

32. BANA's witness testified that BANA did not know if it paid cash at foreclosure or even if money was exchanged at foreclosure. Exhibit N (BofA dep. at 61:5-63:10). Nothing was found in the files in that regard. *Id.* (BofA dep. at 65:13-69:9).

33. BANA had no information as to whether it provided anything of value to purchase Goodson's property at foreclosure, and it testified that it was not aware of providing anything of value to purchase Goodson's home at foreclosure. *Id.* (BofA dep. at 119:8-18). BANA did not know whether it paid cash or anything of value for the property, as indicated in

5

the substitute trustee deed filed in state court by S&K on its behalf. *Id.* (*See* BofA dep. at 120:1-128:5).

34. Goodson received another communication from BANA in January 2013, which stated a "payoff amount" of $310,784.22 or her loan. Exhibit N (BofA Dep. and Ex. 95).

35. BANA mailed Goodson a letter which she received on May 9, 2011, indicating that servicing rights on her loan would transfer to BANA effective July 1, 2011, page 3 of which specifically indicated that "the servicing of [her] mortgage <u>and the right to collect payments in connection with [her] loan</u>" will be transferred effective July 1, 2011. Exhibit U (emphasis added)

36. On or about July 1, 2011, BNA mailed a letter which Plaintiff received around July 8, 2011, ("July 8 Letter") stating that servicing her home loan was transferred from BACHLS to BANA. SMF #10.

37. Goodson received a letter dated July 21, 2011 from BANA acknowledging her letter of July 8, 2011, requesting verification of the debt. Exhibit V.

### Response to Defendant's Statement of Material Facts (SMF)

1. On March 21, 2008, Plaintiff executed a note (the "Note") in favor of Taylor, Bean and Whitaker Mortgage Corporation in the principal amount of $235,226.00. Response to Requests for Admission ¶ 1; the Note, attached hereto as Exhibit A.

**Response:** There is no dispute that Goodson signed a Note on or around March 21, 2008 to obtain a loan from Taylor, Bean & Whitaker Mortgage Corporation in the amount of $235,226.00. Plaintiff does dispute that Exhibit A is the note she signed that day (the note she signed did not have the stamp on the last page).

6

2. On March 21, 2008, Plaintiff executed a deed of trust ("Deed of Trust") conveying her residence, located at 6914 Mcadoo Branch Road, Lyles, Tennessee 37098 to secure payment of the Note in the amount of $235,226. Plaintiff's Responses to Requests for Admission ¶ 2, attached hereto as Exhibit C; Deed of Trust, attached hereto as Exhibit B.

**Response:** There is no dispute that Goodson executed the Deed of Trust on or about March 21, 2008 in relation to the subject property and the loan in the amount of $235,226.00.

3. Under the loan's terms, Plaintiff agreed to make monthly payments of principal and interest in the amount of $1372.72 starting May 1, 2008. *See* Exhibit A.

**Response:** Not disputed.

4. In March 2009, Plaintiff stopped paying her mortgage and defaulted on her mortgage obligations. Plaintiff's Responses to Requests for Admission, attached hereto as Exhibit C; Excerpts of Deposition Testimony of Inge Goodson, taken on March 20, 2013, attached hereto as Exhibit L, 20:18--21:2.

**Response:** Not in dispute that based on Taylor, Bean and Whitaker's instruction, Goodson did not make payments on the Note in 2009, which Taylor, Bean and Whitaker deemed a default.

5. On August 23, 2009, BAC Home Loan Servicing LP ("BACHLS") sent Plaintiff a letter ("August 23 Letter") stating the servicing of Plaintiff's home loans was recently transferred to BACHLS, and this letter included a Fair Debt Collection Practices ("FDCPA") notice. Compl. ¶ 13; August 23 Letter, attached hereto as Exhibit D.

**Response:** Not in dispute that Goodson received the letter, but the facts regarding the letter are incomplete. For example, that letter also indicated that the "name of the creditor to whom the debt is owed: GINNIE MAE." The letter further provides that "[u]nder the Fair Debt Collection Practices Act" BACHLS (now BANA) "is considered a debt collector." That

7

BACHLS (since merged into BANA) admitted in the letter that it is a debt collector corresponds to the fact that BANA obtained servicing rights to the loan only after Goodson's loan was in default and for the purpose of collecting it for another. *See* CSF # 9-12, above.

6. On or about May 10, 2010, Plaintiff received a letter ("May 6 Letter") from Shapiro & Kirsch, LLP, dated May 6, 2010, stating that it had been retained to collect on a debt owed to their client. Compl. ¶ 15; May 6 Letter, attached hereto as Exhibit E.

**Response:** Not in dispute.

7. On August 3, 2010, the Property was foreclosed on. *See* Compl. ¶ 17; Exhibit L at 24:21-25.

**Response:** Not in dispute that BANA and S&K have represented that the property was foreclosed upon on August 3, 2010. There remains a question of fact for the jury to resolve as to whether BANA actually did pay money or anything of value at the foreclosure, as BANA and S&K represented that BANA paid cash at foreclosure, yet BANA could not confirm whether it paid cash or anything of value, and its debt collection communications to Goodson show it did not. *See* CSF # 30-33, above.

8. Following the foreclosure, Plaintiff remained living in the Property and is currently still living in the Property. Exhibit L at 5:9-13.

**Response:** Not in dispute, but incomplete. BANA has been unable to evict Goodson in state court proceedings initiated by BANA (via S&K) because of the Court denied judgment to BANA due to questions of fact regarding irregularities and questions of fact noted in the foreclosure and eviction process in those state court proceedings.

9. Plaintiff has not made any payments on her Loan or rent payments for the Property since March 2009. Exhibit L at 20:24-21:16.

8

**Response:** Immaterial, but not in dispute.

10. On or about July 8, 2011, Plaintiff received a letter ("July 8 Letter") from BANA stating that servicing her home loan was transferred from BACHLS to BANA. Compl. ¶ 20; July 8 Letter, attached hereto as Exhibit F.

**Response:** Not in dispute, but the facts regarding the letter are incomplete.

11. Plaintiff was asked to identify where the July 8 Letter makes a demand for payment. The only specific demand that Plaintiff was able to identify was the notice at the bottom of the first page of the July 8 Letter that states: "Bank of America, N.A. is required by law to inform you that this communication is from a debt collector attempting to collect a debt." Exhibit L at 24:14-15, 25:14-26:4, 26:5-27:7.

**Response:** Disputed. In addition to specific language written by BANA on the first page that it is a "debt collector attempting to collect a debt," Goodson testified in the cited deposition pages to additional elements of the letter that show BANA was attempting to collect a debt, including: that it states the amount owed and that the letter specifically referenced making payments. Counsel did not close out this line of questioning.

Indeed, the letter plainly states it is a communication related to the collection of a debt. On page 3 of 4 (Dkt. 22-6 at p.4 of 5) it states: "Bank of America, N.A. must provide certain information to you in order to make sure you are informed when a communication is related to a debt. The purpose of this letter is therefore to provide you with information required by law, including the amount of the debt." On that same page, it further states:

> <u>Bank of America, N.A. is required by law to inform you that this communication is from a debt collector attempting to collect a debt, and any information obtained will be used for that purpose. Notwithstanding the foregoing, if you are currently in a bankruptcy proceeding or have received a discharge of the home loan debt referenced above, this statement is being furnished for informational purposes only. It should not be construed as an attempt to collect against you personally, Bank of America, N.A. will take no steps</u>

9

> to collect from you personally or against the property securing this loan while the
> bankruptcy's automatic stay remains in effect.

*Id.* (emphasis added). The clear implication from this language is that if Goodson is not currently in bankruptcy or had received a discharge of the debt (which she had not), then the letter should be construed as an attempt to collect against her and that BANA would take steps to collect from her.

Moreover, the letter states on multiple occasions that BANA is a "debt collector" and that BANA's letter is "from a debt collector attempting to collect a debt, and any information obtained will be used for that purpose." Ex. F at p. 1 (Dkt. 22-6 at p.3 of 5) (twice stating BANA is debt collector and stating it is an attempt to collect a debt); *id.* at p.3 (Dkt. 22-6 at p.4 of 5) (same).

In her interrogatory responses, Plaintiff also stated additional elements of her contention that BANA was attempting to collect a debt or demanding payment of money. *See* Exhibit J, Goodson interrogatory responses at pp. 7-9 (Dkt #22-10, pp.8-10).

12.     Plaintiff received a letter dated July 13, 2011 ("July 13 Letter") from BANA informing her that the July 8 Letter was sent in error and asking Plaintiff to disregard the July 8 Letter. July 13 Letter, attached hereto as Exhibit G; Exhibit L at 27:13-25.

**Response:**     Immaterial, but not in dispute.

13.     On July 8, 2011, Plaintiff sent a letter to BANA disputing the debt mentioned in the July 8 Letter from BANA. Comp. ¶ 22; July 8, 2011 Letter from Plaintiff to BANA, attached hereto as Exhibit H.

**Response:**     Not disputed.

10

14. In a letter dated October 7, 2011 ("October 7 Letter"), Blank Rome LLP, on behalf of BANA, responded to Plaintiff's July 8, 2011, letter requesting verification of her debt. Compl. ¶ 22; October 7 Letter, attached hereto as Exhibit I.

**Response:** Not disputed, but noted that Exhibit I is incomplete. A complete copy of the October 7 letter is attached as Exhibit 8 to Goodson's deposition which is in the record at Ex. L (Dkt. 22-12, pp. 47-97).

15. Plaintiff was unable to identify where the October 7 Letter made a demand for payment. Exhibit L at 40:3-41:5.

**Response:** Disputed. The cited testimony pages show that Goodson testified that the letter came from attorneys for BANA, reference a payment history on the loan (and enclose a partial payment history), and state that they have requested a payoff demand statement to be forwarded to Goodson. Goodson understood the payoff demand statement to mean that BANA was demanding payment of the amount referenced in the letter. Counsel did not close out this line of questioning.

The October 7 letter also states: "In providing the above response, Bank of America is not limiting or waiving any rights or remedies it may now or hereafter have, whether arising under the Loan documents, at law or in equity, all of which rights and remedies are expressly reserved." This also is evidence of a demand for payment.

In her interrogatory responses, Plaintiff also stated additional elements of her contention that BANA was attempting to collect a debt or demanding payment of money. *See* Exhibit J, Goodson interrogatory responses at pp. 7-9 (Dkt #22-10, pp.8-10).

16. Blank Rome LLP is not the law firm that conducted the foreclosure on Plaintiff's property. *See* Compl. ¶ 15.

11

**Response:**   Immaterial, but not in dispute.

17. Plaintiff was asked to "describe in detail the damages allegedly caused by the letter she received on or about July 8, 2011." *See* Plaintiff's Response to BANA's First Set of Interrogatories, attached hereto as Exhibit J. Plaintiff stated only that she "claims emotional harm damages arising from such letter." *See* Exhibit J.

**Response:**   Not disputed, but plaintiff states that emotional harm damages should be evaluated by a jury.

18. Plaintiff was asked to "describe in detail the damages allegedly caused by the letter dated October 7, 2011." *See* Exhibit K. Plaintiff stated only that she "claims emotional harm damages arising from such letter". *See* Exhibit J.

**Response:**   Not disputed, but plaintiff states that emotional harm damages should be evaluated by a jury.

19. BANA requested an itemized statement of all damages Plaintiff claims to have suffered as a result of BANA's alleged actions. *See* Exhibit J. Plaintiff again stated that she "claims emotional harm damages arising from tehse [sic] violations" but did not provide any additional description of her alleged injuries or the circumstances surrounding those injuries. *See* Exhibit J.

**Response:**   Not disputed, but plaintiff states that emotional harm damages should be evaluated by a jury.

20. Plaintiff was asked to "produce any documents related to the total computation of damages claims in the Lawsuit"; "produce any and all documents which demonstrate that you suffered damages as a result of Defendant's letter allegedly received by Plaintiff on or about July 8, 2011"; "produce any and all documents which demonstrate that you suffered damages as a

result of Defendant's letter dated October 7, 2011." *See* Plaintiff's Responses to BANA's First Set of Requests for Production of Documents, attached hereto as Exhibit K at ¶¶ 11, 12 and 13.

**Response:** Not disputed.

21. As of April 15, 2013, Plaintiff has provided no documents to BANA as evidence of any actual damages that Plaintiff alleges she incurred on or after July 8, 2011. *See* Exhibits K; Exhibit L.

**Response:** Disputed. Plaintiff produced documents describing damages and testified to damages in discovery.

22. Plaintiff left her job at Southeastern Pant Company before she received the July 8, 2011 letter or the October 7, 2011 letter. *See* Exhibit F; Exhibit I; Exhibit L at 13:7-24.

**Response:** Not disputed, but immaterial. Plaintiff claims injuries for communications and debt collection activities prior to that time.

23. Plaintiff saw her therapist, Dr. Champion, for the first time after the foreclosure sale in 2010. *See* Exhibit L at 14:7-12.

**Response:** Not disputed.

24. Plaintiff testified in her deposition that her doctor and therapist appointments took place beginning in September 2010 and continuing for about six or seven months. Exhibit L at 13:25-14:16.

**Response:** Not disputed.

25. Plaintiff testified that she scheduled an appointment with her therapist in July 2011. Exhibit L at 31:3-13.

**Response:** Plaintiff testified she believed she saw her therapist in July 2011 after receiving the letter from BANA. Ex. L. at 31:3-33:10.

13

26. Plaintiff stopped taking the antidepressants that Dr. Champion prescribed to her before she received the July 8, 2011 letter or the October 7, 2011 letter. *See* Exhibit L at 15:2-13.

**Response:** Not disputed, but immaterial.

27. Plaintiff has produced no evidence of actual damages that occurred on or after October 7, 2011. *See* Exhibit J; Exhibit K; Exhibit L.

**Response:** Disputed, but immaterial. Plaintiff seeks damages for BANA's conduct since August 2009.

                Respectfully submitted,

By:     /s/ John R. Ates
     John R. Ates, (pro hac vice)
     Ates Law Firm, P.C.
     1800 Diagonal Road, Suite 600
     Alexandria, VA 22314
     Telephone: (703) 647-7501
     Facsimile: (703) 229-6430
     Email: j.ates@ateslaw.com

     Patrick Barrett (No. 20394)
     Barrett Law Office, PLLC
     2021 Richard Jones Road, Suite 300
     Nashville, Tennessee 37215
     Telephone: (615) 463-4000
     Facsimile: (615) 463-3717
     Email: pbarrett@barrettlawofficetn.com

     Henry Franklin Todd, Jr.
     Todd & Spencer Law Firm
     404 E College Street
     Dickson, TN 37055
     (615) 446-0511
     Fax: (615) 441-3437
     Email: henrytoddjr@bellsouth.net

     *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and exact copy of the foregoing has been served this 29th day of May, 2013, via the Court's CM/ECF system on the following counsel:

Lauren Paxton Roberts
Paul Allen England
Stites & Harbison, PLLC (Nashville)
SunTrust Plaza
401 Commerce Street
Suite 800
Nashville, TN 37219
(615) 782-2284
Fax: (615) 742-0729
Email: lauren.roberts@stites.com
*paul.england@stites.com*

Kelli Burns (pro hac vice)
McGuireWoods LLP
201 N. Tryon St.
Suite 3000
Charlotte, NC 28202
Direct Dial: 704-343-2172
Direct Fax: 704-373-8828
*kburns@mcguirewoods.com*

*Counsel for Bank of America, N.A*

                                                    /s/ John R. Ates
                                         John R. Ates, (pro hac vice)
                                         Ates Law Firm, P.C.
                                         1800 Diagonal Road, Suite 600
                                         Alexandria, VA 22314
                                         Telephone: (703) 647-7501
                                         Facsimile: (703) 229-6430
                                         Email: j.ates@ateslaw.com

                                         *Counsel for Plaintiff*