IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| INGE GOODSON, ) | |
|     Plaintiff, ) | Case No. 1:12-cv-65 |
| ) | Judge Sharp |
| v. ) | Magistrate Judge Knowles |
| ) | |
| BANK OF AMERICA, N.A. ) | |
|     Defendant. ) | |

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Court should deny Defendant Bank of America, N.A.'s (BANA) motion for summary judgment in this Fair Debt Collection Practices Act (FDCPA) case. BANA's arguments lack merit, and there are disputed issues of material fact only a jury can resolve.

**FACTUAL BACKGROUND[1]**

This case involves a defaulted home mortgage and illegal collection demands arising from the default. This case is significantly intertwined with the pending case styled, *Goodson v. Shapiro & Kirsch, LP*, 1:11-cv-31. Plaintiff believes these cases should be consolidated for trial.

Plaintiff Inge Goodson refinanced a home in Lyles, Tennessee with a residential mortgage loan from Taylor, Bean & Whitaker (TBW). Dkt. 25, CSF #1. Goodson's mortgage was included in a mortgage-backed security (MBS) via Ginnie Mae. *Id.*, CSF #2. The MBS owns the notes that comprise the MBS. *See id.* at CSF #3-5. The mortgage-backed security holder, the Federal Reserve Bank of New York, owned the mortgage, and payments were due it. *Id.*, CSF #6. TBW told Goodson she needed to default on her mortgage in order to qualify for a loan modification, so Goodson stopped making payments. *See id.* Response to SMF #4.

---

[1] We rely heavily on Docket 25, which is Goodson's counterstatements of material facts and response to BANA's statement of facts. A reference to "SMF ___" is to the response to Defendant's statement of fact. A cite to "CSF ___" is to Plaintiff's counterstatements of fact.

Although she entered into a forbearance agreement with TBW, while she attempted to get a loan modification, Goodson's loan was in default in approximately March or April 2009. *See id.* Ginnie Mae defaulted TBW on August 4, 2009. *Id.*, CSF #7. This meant TBW no longer had any authority to act in regard to Goodson's loan. *Id.*, CSF #8.

After Goodson was in default on her note and after Ginnie Mae defaulted TBW, BANA sent Ms. Goodson a letter dated August 23, 2009, stating that "the servicing of your home loan was recently transferred to[BANA]" and that "[u]nder the Fair Debt Collections Practices Act . . . [BANA] is considered a debt collector." Dkt. 25, CSF #11.[2] BANA had no rights or role regarding Goodson's loan prior to that. *Id.* at CSF #9. That same August 2009 letter indicated that Ginnie Mae was the creditor to whom Goodson's debt was owed. *Id.* at CSF #11. BANA was solely attempting to collect the debt for Ginnie Mae, as BANA would have collected any monies and remitted them to Ginnie Mae. *Id.* at CSF #12. Because Goodson's loan was in default when BANA began servicing it, and because BANA was attempting to collect payments on behalf of Ginnie Mae, BANA rightfully called itself a debt collector in its letter to Goodson. *See id.*; 15 U.S.C. § 1692a(4) ("Under the FDCPA, the term 'creditor' means any person who offers or extends credit creating a debt or to whom a debt is owed, <u>but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another</u>.").

BANA's lawyers, Shapiro & Kirsch, LP (S&K) sent Goodson a notice dated May 6, 2010, informing her that it had been retained to collect the debt secured by plaintiff's home. Dkt. 25, CSF #13, 18. S&K's notice stated that it was being sent pursuant to the FDCPA. *Id.* at CSF #18. S&K's dunning letter identified "BAC Home Loans Servicing, LP" as the creditor on the

---

[2] BAC Home Loan Servicing, LP has since merged into Bank of America, N.A., effective July 1, 2011. Plaintiff refers to both entities as BANA.

2

loan. *Id.* BAC did not own or hold the note at that time. *See id.*, at CSF #15, 24. And, even if it did hold the note, BAC was attempting to collect payments on the note for another, after the note was already in default, so it could not be a creditor. *Id.*, CSF #12, 20.

On behalf of its client BANA, S&K then sent Goodson a letter in July 6, 2010, enclosing a notice of foreclosure sale. *Id.*, CSF #21-22. The notice stated that BANA was the owner of her debt. *Id.* That is false, as BAC did not own the loan. *Id.* CSF #22.

S&K then prepared a notice of substitute trustee document and had it filed it in the county lands records. *Id.*, CSF #23-24. The July 2010 substitute trustee document falsely states that BAC owns and holds the note. *See id.*, CSF #21-24. BANA knew it did not own the loan at that time, as it has filed an affidavit in the Shapiro & Kirsch case indicating that it did not own the loan. *Goodson v. S&K*, 1:11-cv-31, Docket 82-8, at ¶¶ 5-6 (testifying Ginnie Mae was owner of loan).

S&K then supposedly conducted a non-judical foreclosure sale of Goodson's home on August 3, 2010. *Id.*, response to SMF #7. S&K completed two trustee's deed indicating that BAC paid cash at foreclosure and assigning title from BAC to Ginnie Mae. *See id.*; *id.* at CSF #27. S&K started a proceeding in state court to eject Goodson from the property. *Id.* at CS #28-29. That action, in addition to seeking possession of the property, also "reserved damages." *See id.* BANA (via its predecessor company) also required Ms. Goodson to post a bond when she appealed the award of the property to BANA.

In that detainer action, S&K filed an affidavit and substitute trustee deed indicating that BANA bought the property at foreclosure for cash. *See id.* Yet, BAC did not by the property at foreclosure for cash. *Id.*, CSF #30-33. S&K testified that the property was a "dead credit bid" whereby no money was paid, but that Goodson's loan should be reflected as paid in full. *Id.* at

3

#26. BANA has testified it does not know if it purchased the property at foreclosure or paid anything of value. *Id.*, CSF #32-33. BANA also has sent Goodson notices indicating that she still owes a balance on her loan. *Id.*, CSF #30-31, 3437.

Specifically, BANA mailed Goodson a letter which she received on May 9, 2011, indicating that servicing rights on her loan would transfer to BANA effective July 1, 2011, page 3 of which specifically indicated that "the servicing of [her] mortgage <u>and the right to collect payments in connection with [her] loan</u>" will be transferred effective July 1, 2011. *Id.* CSF #35. In July 2011, nearly a year after the supposed purchase at foreclosure, BANA sent Goodson a letter indicating she owed more than $278,000. *Id.*, CSF #30. That letter also names a different entity than Ginnie Mae as the creditor (apparently naming the trust). *See id.* Goodson requested verification, and Bank of America sent her a letter with a payment history, which does not show that any credit was applied toward her loan from the supposed foreclosure sale. *Id.*, CSF #31. That October 2011 letter identifies Ginnie Mae as the owner of her loan, which conflicts with BANA's July 2011 letter identifying the apparent trust as the creditor. *Id.* That October 2011 letter stated a payoff statement "<u>will show all amounts necessary to pay off</u>" her previous loan. *Id.* (emphasis added). That same letter specifically indicated that BANA "<u>is not limiting or waiving any rights or remedies it may now or hereafter have, whether arising under the Loan documents, at law or inequity, all of which rights and remedies are expressly reserved</u>." *Id.* (emphasis added).

In January 2013, BANA sent Goodson documents indicating that she owes more than $300,000. *Id.*, CSF #34. That letter that included statements that read:

> "This notice is to advise you of **requirements that must be followed to accomplish a prepayment of your mortgage, and to advise you of requirements you must fulfill upon prepayment to prevent accrual of any interest after the date of prepayment**.

4

> **The amount listed below is the amount outstanding on the loan for prepayment of the indebtedness due under your mortgage. This amount is good through 02/07/2013. (The amount provided is subject to further accounting adjustments. Also, any mortgage payments received or advances made by us before the stated expiration date will change the prepayment amount.**)
>
> **PAYOFF AMOUNT: $310,784.22**
>
> You may prepay your mortgage at any time without penalty. However, in order to avoid the accrual of interest on any prepayment after the date of prepayment, the prepayment must be received on the installment due date (the first day of the month). Otherwise, you may be required to pay interest on the amount prepaid through the end of the month.
>
> If you have any questions regarding this notice, please contact Customer Service at (800) 669-6607."

*Id.* (some emphasis added; bolded payoff amount in original).

## ARGUMENT

The FDCPA was enacted as a broad remedial statute to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The FDCPA regulates the conduct of debt collectors, imposing affirmative obligations and broadly prohibiting abusive practices. *See, e.g.,* 15 U.S.C. §§ 1692b-1692i. "The statute imposes strict liability for violations." *Kistner v. Law Offices of Michael P. Margelefsky, LLC*, 518 F.3d 433, 438 (6th Cir. 2008). The statute allows the consumer to recover statutory or actual damages.

**I. THE DISCOVERY RULE, EQUITABLE TOLLING AND THE CONTINUING VIOLATION DOCTRINE EACH APPLY TO ALLOW CLAIMS AGAINST BANA BASED ON ITS CONDUCT FROM AUGUST 2009 FORWARD, TO INCLUDE THE AUGUST 23, 2009 LETTER, THE MAY 6, 2010 LETTER AND THE FALSE STATEMENTS RELATING TO GOODSON'S FORECLOSURE.**

Defendant argues that any acts by it prior to one year before Goodson sued are time-barred. Dkt. # 21 (SJ Memo.) at 4-6. Defendant is in error, as it fails to discuss the impact of the

5

Case 1:12-cv-00065   Document 26   Filed 05/29/13   Page 5 of 19 PageID #: 661

discovery rule, the continuing violation doctrine or equitable tolling on Goodson's claims. Each of those doctrines allows Goodson to base her claims on BANA's conduct since August 2009.

The Court should deny BANA's request for summary judgment as to its letters, communications and other debt collection activities prior to July 2011.

### A. The Discovery Rule Applies To Delay The Accrual Of The Limitations Period Due To BANA's Self-Concealing Fraud.

As recently explained by the Supreme Court in *Gabelli v. Securities Exchange Commission*, __ U.S. __, 133 S.Ct. 1216, 1221-22 (2013), the discovery rule may be invoked to extend the period of limitations by victims of a self-concealing fraud, but not by the government in its role as enforcer of a civil penalty.[3] The Court discussed the importance of finality and of clarity in the operations of statutes of limitations, and explained:

> Notwithstanding these considerations, the Government argues that the discovery rule should apply instead. Under this rule, accrual is delayed "until the plaintiff has 'discovered'" his cause of action. . . . The doctrine arose in 18th-century fraud cases as an "exception" to the standard rule, based on the recognition that "something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even knowing that he or she has been defrauded." . . . This Court has held that "where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered.'" . . . And we have explained that "fraud is deemed to be discovered when, in the exercise of reasonable diligence, it could have been discovered." . . .
>
> But we have never applied the discovery rule in this context, where the plaintiff is not a defrauded victim seeking recompense, but is instead the Government bringing an enforcement action for civil penalties. . . .

*Id.* (citations omitted). The Court continued:

> There are good reasons why the fraud discovery rule has not been extended to Government enforcement actions for civil penalties. The discovery rule exists in part to preserve the claims of victims who do not know they are injured and who

---

[3] Prior to *Gabelli*, the Sixth Circuit reserved the question "whether the FDCPA incorporates a discovery rule or permits equitable tolling." *Ruth v. Unifund CCR Partners*, 604 F.3d 908, 914 (6th Cir. 2010).

6

> reasonably do not inquire as to any injury. Usually when a private party is injured, he is immediately aware of that injury and put on notice that his time to sue is running. But when the injury is self-concealing, private parties may be unaware that they have been harmed. Most of us do not live in a state of constant investigation; absent any reason to think we have been injured, we do not typically spend our days looking for evidence that we were lied to or defrauded. And the law does not require that we do so. Instead, courts have developed the discovery rule, providing that the statute of limitations in fraud cases should typically begin to run only when the injury is or reasonably could have been discovered.

*Id.*, at 1222. The Court went on to discuss the many investigative tools available to the SEC, including the provision of monetary awards to whistleblowers, and the fact that the SEC is empowered to seek relief other than compensatory relief to victims.

In light of *Gabelli*, this court should apply the discovery rule and allow claims based on the false and fraudulent statements by Bank of America—and its agent, S&K—starting in 2009. From 2009 through the foreclosure in August 2010, Goodson did not have evidence that she was lied to or defrauded. Indeed, S&K and BANA filed documents in the county land records under oath in July 2010 stating falsely that BANA owned and held the note at issue. S&K and BANA filed affidavits under oath (though false) testifying that that BANA bought the property at foreclosure for cash.

It was not until BANA's counsel confirmed in October 2011, by enclosing the payment history, that no payment or credit associated with the foreclosure was made on Goodson's loan that Goodson could even begin to realize the potential fraud that BANA, with the complicity of its agent S&K, was committing. It was not until the March 12, 2013 deposition of BANA, when BANA admitted that it does not know if it purchased the property at foreclosure or paid anything of value. That, of course, directly belies the materials BANA, via its agent S&K, filed in the state court proceeding and upon which the state court relied in awarding the property to BANA.

7

Goodson could not fully discover this conduct prior to March 12, 2013. The discovery rule applies to extend the statute of limitations back to the beginning of BANA's actions in August 2009.

**B. Equitable Tolling Applies To Extend The Limitations Period.**

In order to establish equitable tolling by fraudulent concealment, plaintiffs must allege and establish that: 1) defendant concealed the conduct that constitutes the cause of action; 2) defendant's concealment prevented plaintiffs from discovering the cause of action within the limitation period; and 3) until discovery of the cause of action, plaintiff exercised due diligence in trying to find out about the cause of action. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988).

As shown above in regard to the discovery rule, BANA (with the assistance of S&K) concealed facts that supported Goodson's cause of action against BANA. They did this through improper public record filings and filings in state court that a state court relied on. There was no information publically available through which Goodson could uncover the true facts. *See Ruth v. Unifund CCR Partners*, 604 F.3d 908, 913 (6th Cir. 2010) (noting in FDCPA case: "We might toll a statute of limitations if a plaintiff diligently searches publicly available information but fails to discover a hidden defect."). Indeed, the public information filed by BANA was false and deceptive. BANA has continued its state court suit to evict Goodson, even though it knows it cannot testify that it paid anything of value for Goodson's home, despite its prior affidavit stating otherwise. BANA's very acts prevented Goodson from being able to assert, in conformance with Rule 11, an FDCPA claim against BANA prior to the time she filed the present suit. It was only through compelled testimony in this case that BANA finally spilled the beans that what it said under oath in the state court proceeding was not true and that it could not testify that it purchased

8

or paid anything of value for Goodson's home at the foreclosure sale and that it did not own Goodson's note.

The Court should equitably toll the statute of limitations. BANA should not benefit from its prior misconduct.

### C. The Continuing Violations Doctrine Applies To Allow Consideration of BANA's Ongoing Course of Conduct.

Courts have held that the continuing violation doctrine applies to FDCPA suits. *See Joseph v. J.J. MacIntyre Cos.*, 281 F. Supp. 2d 1156, 1161 (N.D. Cal. 2003); *Padilla v. Payco Gen. Am. Credits, Inc.*, 161 F. Supp. 2d 264, 273 (S.D.N.Y. 2001) ("the statute of limitations is not intended to deprive plaintiffs of the use of evidence of violations that took place more than a year before filing, but rather to protect defendants by ensuring that the action is filed <u>within one year of the most recent date on which the defendant is alleged to have violated the FCPDA</u>.") (emphasis added). Indeed, Judge Trauger recently applied the doctrine and analyzed "the entire course of defendant's conduct" in an FDCPA case. *See Tarrant v. Northland Group, Inc.*, 2012 U.S. Dist. LEXIS 5489, at *9, fn.8, 2012 WL 140431 (M.D. Tenn. Jan. 18, 2012).

"The key is whether the conduct complained of constitutes a continuing pattern and course of conduct as opposed to unrelated discrete acts. If there is a pattern, then the suit is timely [. . .] and the entire course of conduct is at issue." *Johnson*, 281 F.Supp.2d at 1161. Here, the complained of conduct is part and parcel of a continuing pattern and course of conduct by BANA (and its agent S&K) relating to Goodson's loan, the foreclosure on her home and the continued collection efforts after the foreclosure, both via the state court proceedings and BANA's continued letters. This clearly is a pattern of using "false, deceptive, or misleading representation or means" in connection with attempts to collect Goodson's debt.

9

As such, BANA's "entire course of conduct is at issue," and Goodson may base her claims on BANA's conduct since 2009, when it began servicing her loan and the pattern of false and deceptive practices started.

## II. A REASONABLE JURY COULD DECIDE A FACT ISSUE AND CONCLUDE THAT BANA'S ACTIONS WERE "IN CONNECTION WITH THE COLLECTION OF [A] DEBT" AND, THEREFORE, ARE GOVERNED BY THE FDCPA.

This case involves § 1692e and § 1692g. Complaint (Dkt. #1). Section 1962e prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Section 1962g requires that "[w]ithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing" certain proscribed information. 15 U.S.C. § 1692g(a). This required information includes the amount of the debt, the name of the creditor to whom the debt is owed and the right to dispute the debt. *See* 15 U.S.C. § 1692g(a)(1)-(5). If a consumer disputes the debt, the "debt collector shall cease collection of the debt" until certain conditions are met. *See* 15 U.S.C. § 1692g(b).

The FDCPA sweeps with "extraordinar[y]" breadth. *Frey v. Gangwish*, 970 F.2d 1516, 1521 (6th Cir. 1992). The FDCPA "imposes strict liability for violations," *Kistner*, 518 F.3d at 438, which means "a consumer may recover statutory damages if the debt collector violates the FDCPA even if the consumer suffered no actual damages." *Fed. Home Loan Mortgage Corp. v. Lamar*, 503 F.3d 504, 513 (6th Cir. 2007) (citing 15 U.S.C. § 1692k(a)).

It its motion papers, BANA contends that its communications at issue are not subject to the FDCPA because they are not "in connection with the collection of any debt" or "to collect

10

any debt." Memo. at 6 (Dkt. #21).[4] Yet, BANA seeks judgment on an issue of fact that is in dispute and must be resolved by a jury.

### A. A Reasonable Jury Could Conclude from the Circumstances that the Communications Were "In Connection With" an Attempt To Collect a Debt.

Whether a communication is "in connection with" the collection of a debt is a fact question for the jury to decide, unless no reasonable jury could so conclude. *See Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011). As stated by the Seventh Circuit, "whether a communication was sent 'in connection with' an attempt to collect a debt is a question of objective fact, to be proven like any other fact." *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 386 (7th Cir. 2010) (quoting *Ruth v. Triumph Partnerships*, 577 F.3d 790, 798 (7th Cir. 2009)). In *Grden*, the Sixth Circuit adopted *Gburek*'s test for determining whether a communication was "in connection with" an attempt to collect a debt. *Grden*, 643 F.3d at 173.

In regard to the test to apply, relying on *Gburek*, the *Grden* court stated,

> for a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor. *See* [*Gburek*] at 385 ("a communication made specifically to induce the debtor to settle her debt will be

---

[4] BANA does not challenge the substantive merits of Goodson's § 1692e and § 1692g claims. Therefore, Goodson does not discuss the substantive violations by BANA, but restricts her response to show BANA's arguments for summary judgment lack merit. Goodson reserves all substantive merit arguments to show BANA violated §§ 1692e and 1692g.

"In order to establish a claim under § 1692e: (1) plaintiff must be a "consumer" as defined by the Act; (2) the "debt" must arise out of transactions which are "primarily for personal, family or household purposes;" (3) defendant must be a "debt collector" as defined by the Act; and (4) defendant must have violated § 1692e's prohibitions." *Wallace v. Washington Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012). The first two elements are satisfied, as Goodson is a consumer and "a home loan is a 'debt' even if it is secured." *See Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 461 (6th Cir. 2013). BANA does not contest in its summary judgment papers that it is not a debt collector. BANA violated § 1692e and § 1692g by misidentifying the creditor and by falsely stating the amount Goodson owed on her loan, among other actions discussed herein. Indeed, BANA stated in state court papers that it purchased Goodson's loan for cash, in essence for the balance of Goodson's loan. However, BANA then sent Goodson letters in which it stated Goodson still owed money on the loan and which showed that no credit was made against her loan to pay it off.

11

sufficient to trigger the protections" of the Act). Obviously, communications that expressly demand payment will almost certainly have this purpose. But so too might a communication that merely refers the debtor to some other communication that itself demands payment. *See*, *e.g.*, *id.* at 386 (third-party letter directing debtor to contact creditor was sent in connection with collection of a debt). Thus, to use the language of § 1692e, a letter that is not itself a collection attempt, but that aims to make such an attempt more likely to succeed, is one that has the requisite connection.

*Grden*, 643 F.3d at 173. "Several factors" "come into play in "the commonsense inquiry of whether a communication from a debt collector is made in connection with the collection of any debt." *Gburek*, 614 F.3d at 385. One significant factor is the "nature of the nature of the parties' relationship." *See id.* Where the "only relationship the defendant[]had with the plaintiff[] arose out of . . . plaintiffs' defaulted debt," then this factor weighs in favor of finding a communication "in connection with" a debt collection attempt. *See id.* (citing *Ruth*, 577 F.3d at 799 (finding that communication was sent "in connection with" debt collection attempt based on this factor)). "The purpose and context of the communications--viewed objectively--are important factors as well." *Gburek*, 614 F.3d at 385.

Applying these principles here, it is clear that the August 2009 letter from BANA (falsely identifying Ginne Mae as the creditor, as opposed to the MBS trust) and May 6, 2010 letter (falsely identifying BANA as the creditor) were an attempt to collect a debt. Goodson was in default on her loan at the time, and BANA had sent the August 2009 letter for Goodson to induce her to make payments on the loan. The May 2010 letter clearly is debt collection activity as the first step in attempting to foreclose. *See Glazer*, 704 F.3d at 461 (holding non-judicial foreclosure is debt collection activity). BANA's false statements in the foreclosure process, and subsequent to foreclosure in an effort to obtain the home also constitute debt collection activity under *Glazer*.

12

BANA focuses its argument on the July 2011 and October 2011 letters in claiming, relying on *Grden*, that they are not governed by the FDCPA. Memo. at 6-12.

BANA's reliance on *Grden* to try to show that these false and misleading 2011 communications with Goodson do not fall within the FDCPA is unavailing. In *Grden*, the plaintiff owed a medical provider and the debt was referred to a collections agency, which hired defendant law firm to collect the debt. *Grden*, 643 F.3d at 171. The law firm sued the plaintiff for the outstanding debt, and the plaintiff then called the law firm to verify his account balance. *Id.* A law firm employee told the plaintiff he owed more than he actually did, and the plaintiff sued the law firm for violating the FDCPA. *Id.* Applying the test set out above, the *Grden* found "the decisive point is that [defendant] made the balance statements only after [plaintiff] called and asked for them. The statements were merely a ministerial response to a debtor inquiry, rather than part of a strategy to make payment more likely."

Here, none of the communications at issue were made to Goodson at Goodson's request, except the October 7 letter. And, even as to that letter, if BANA believed that its initial July 2011 letter to Goodson was not a communication governed by the FDCPA, then it need not have responded to her request for verification. A jury could conclude based on BANA's action in responding that it knew its July 2011 letter was indeed governed by the FDCPA and that it must respond. And, that October 7 letter stated a payoff statement "<u>will show all amounts necessary to pay off</u>" her previous loan. (emphasis added). That same letter specifically indicated that BANA "<u>is not limiting or waiving any rights or remedies it may now or hereafter have, whether arising under the Loan documents, at law or inequity, all of which rights and remedies are expressly reserved</u>." (emphasis added). A reasonable juror could conclude, based on an

13

objective reading, that this October 2011 communication is "in connection with" an attempt to collect a debt. Indeed, it even includes a payment history on the debt.

Moreover, when placed in context with the July 2011 letter, it is clear that the July 2011 letter and the October 2011 letter are part of BANA's strategy to make payment more likely. This is especially so when considered within the context on an ongoing state proceeding to eject Goodson from the property. BANA specifically "reserved damages" in that proceeding, and Goodson has been required to post a bond on her appeal. Also, BANA had sent Goodson a letter in May 2011 plainly stating that "the servicing of [her] mortgage and the right to collect payments in connection with [her] loan" will be transferred to BANA effective July 1, 2011. Dkt. 25, CSF #35. The July 2011 followed, and stated, among other things, that "Bank of America, N.A. is required by law to inform you that this communication is from a debt collector attempting to collect a debt, and any information obtained will be used for that purpose." This chain of facts, taken in context, clearly would lead an objective reader to conclude that both the July 2011 and October 2011 letters were "in connection with" an attempt to collect the supposed debt.

Finally, the "only relationship [BANA] had with [Goodson] arose out of . . . [Goodson's] defaulted debt," which weighs heavily in favor in these circumstances of finding a communication "in connection with" a debt collection attempt. *See Ruth*, 577 F.3d at 799. The Court should not buy BANA's attempt to window dress this element (Memo. at 10-11) by focusing on which law firm sent the letter and which foreclosed – the point is that all of these communications were sent on behalf of BANA.

The Court should reject BANA's professorial linguistic reading of its letters (e.g., Memo. at 9-10, detailing the word "if" in the July 2011 letter) and examine them in the commonsense

14

manner in which a reasonable juror is expected to, and in context. Doing so results in the conclusion that reasonable jury could conclude from this set of facts and context that the letters were "in connection with" debt collection. The Court should deny summary judgment.

### III. A Reasonable Jury Could Conclude That BANA Is Not Entitled to The Bona Fide Error Defense.

BANA has raised the bona fie error defense in its papers. Memo. at 12-13. Yet, BANA has not filed an answer in this case, so no affirmative defenses have been raised. And, Goodson therefore has not had discovery as to any such affirmative defenses. Goodson therefore requests under FRCP 56(d) that summary judgment be denied and Goodson given an opportunity to conduct discovery on any affirmative defenses that may be raised. (Consolidating this case with the S&K case in September would allow sufficient time for discovery in this regard.)

Regardless, even considering it on this record, the FDCPA contains exceptions to provisions imposing liability on debt collectors. Section 1692k(c), at issue here, provides that:

> "[a] debt collector may not be held liable in any action brought under [the FDCPA] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

15 U.S.C. § 1692k(c).[5] BANA bears the burden of proof on this issue. Here, a reasonable jury could conclude that BANA cannot claim meet its burden of proof on this defense.

"[T]he bona fide error defense applies only to clerical errors." *Dowdy v. Solutia Healthcare TAS, Inc.*, 1:05-0090, 2006 WL 3545047 (M.D. Tenn. Dec. 8, 2006). The error BANA relies on (misnaming a creditor, placing false information in several affidavits, letters and

---

[5] The Act also states that none of its provisions imposing liability shall apply to "any act done or omitted in good faith in conformity with any advisory opinion of the [Federal Trade] Commission." 15 U.S.C. § 1692k(e). That section is not at issue here.

15

notices, false information in a substitute of trustee document, and filing false or misleading information in state court) are not clerical errors. The defense does not apply.

Moreover, the errors are not unintentional. BANA's claimed errors in misidentifying the creditor and falsely stating that it owned the note are inexcusable, when it was in possession of these very facts. Moreover, BANA has provided no excuse for why it claimed in state court that Goodson's home sold for cash at foreclosure, and yet BANA has testified in this case that it did not (and, indeed, S&K testified it was not a cash bid). BANA's error is not unintentional, and the bona fide error defense is unavailable.

Importantly, there is no evidence in the record that BANA had in place procedures to prevent the type of errors that occurred. "A debt collector is not entitled under the FDCPA to sit back and wait until [a mistake is made] and then institute procedures to prevent a recurrence. To qualify for the bona fide error defense under the FDCPA, the debt collector has an affirmative obligation to maintain procedures designed to avoid discoverable errors." *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1007 (9th Cir. 2008).

To avail itself of the defense, a debt collector must maintain "reasonable preventive procedures" aimed at avoiding the errors. *Reichert*, 531 F.3d 1006. Reasonable preventive procedures by debt collectors include: publication of an in-house fair debt collection compliance manual, training seminars on compliance issues, detailed pre-litigation review process, and creditor's verification under oath regarding the accuracy of each charge. *Jenkins v. Heintz*, 124 F.3d 824, 834–35 (7th Cir.1997). BANA has provided no evidence of any of these. In addition to determining whether the debt collector maintained and employed procedures to avoid errors, the procedures must be reasonably adapted to avoid the specific error at issue. *Johnson v.*

*Riddle*, 443 F.3d 723, 729 (10th Cir. 2006).  Here, as noted, there is no evidence such procedures to avoid the specific errors at issue.

> If the bona fide error defense is to have any meaning in the context of a strict liability statute, then a showing of "procedures reasonably adapted to avoid any such error" must require more than a mere assertion to that effect. The procedures themselves must be explained, along with the manner in which they were adapted to avoid the error. *See Wilhelm,* 519 F.3d at 421. Only then is the mistake entitled to be treated as one made in good faith. Because NCS submitted only a conclusory declaration stating that it maintained procedures, we hold that it failed to establish a bona fide error defense under the FDCPA.

*Id.*, 531 F.3d at 1007.

BANA's alleged "oops, it was a mistake" letter (Memo. at 12-13) does not create a bona fide defense.  Indeed, there was no such "error letter" after the May 2011 mailing informing Goodson that the right to collect on her loan would transfer to BANA.  The "oops" letter also come out only <u>after</u> Goodson mailed her debt verification letter, which is further evidence that it was not a mistake, but rather a calculated effort to try to reduce damages on a flagrant FDCPA violation.

Sending a letter <u>after the fact</u>, is not reasonably adapted <u>to avoid the errors at issue</u>.  The Court should deny summary judgment on this issue.

**IV. A Reasonable Jury Could Conclude that Goodson Can Recover Actual Damages.**

BANA argues Goodson is not entitled to emotional harm damages; yet, BANA bases this argument on the false premise that it can only be liable for actions after July 2011, and even then it wrongly claims that the July 2011 and October 2011 letters did not cause harm.  *See* Memo. at 13.

BANA may be liable for its whole course of wrongful (indeed, shameful) conduct, in conjunction with its counsel S&K.  Goodson testified in this case (and in the S&K case) to the substantial emotional harm she suffered as a result of the actions at issue, including panic

attacks, uncontrollable crying, and being depressed. She was diagnosed with depression as a result of the actions at issue. A reasonable juror could conclude she is entitled to substantial emotional harm in that regard. And, this does not include the loss of equity in her home as a result of the false documents filed in state court that lead the state court to grant the property to BANA.

Moreover, even considering just the 2011 events, Goodson testified to having to return to her counselor in 2011 after receiving the July 2011 letter stating she still owed her loan. She testified to the stress it caused. A reasonable jury could award damages in this regard.

Regardless, Goodson provided in discovery details additional actual damages she is claiming. This includes attorneys' fees in excess of $2,000 for counsel to review her situation, as well as the loss of her equity on her home.

## **CONCLUSION**

The Court should deny the motion for summary judgment. The facts and inferences drawn therefrom establish that a reasonable jury could find for Goodson on her claims and award her substantial damages for the false and misleading communications that lead to the loss of her home and almost lead to her becoming homeless.

    Respectfully submitted,

By:       s/ John R. Ates
    John R. Ates, VA Bar #71697 (*pro hac vice*)
    Ates Law Firm, P.C.
    1800 Diagonal Road, Suite 600
    Alexandria, VA 22314
    Telephone: (703) 647-7501
    Facsimile: (703) 229-6430
    Email: j.ates@ateslaw.com

    Patrick Barrett (No. 20394)
    Barrett Law Office, PLLC
    2021 Richard Jones Road, Suite 300

Nashville, Tennessee 37215
Telephone: (615) 463-4000
Facsimile: (615) 463-3717
Email: pbarrett@barrettlawofficetn.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been served this 29th day of May, 2013, via the Court's CM/ECF system on the following counsel:

Lauren Paxton Roberts
Paul Allen England
Stites & Harbison, PLLC (Nashville)
SunTrust Plaza
401 Commerce Street
Suite 800
Nashville, TN 37219
(615) 782-2284
Fax: (615) 742-0729
Email: lauren.roberts@stites.com
*paul.england@stites.com*

Kelli Burns (pro hac vice)
McGuireWoods LLP
201 N. Tryon St.
Suite 3000
Charlotte, NC 28202
Direct Dial: 704-343-2172
Direct Fax: 704-373-8828
*kburns@mcguirewoods.com*

*Counsel for Bank of America, N.A*

             /s/ John R. Ates
            John R. Ates, (pro hac vice)
            Ates Law Firm, P.C.
            1800 Diagonal Road, Suite 600
            Alexandria, VA 22314
            Telephone: (703) 647-7501
            Facsimile: (703) 229-6430
            Email: j.ates@ateslaw.com
            *Counsel for Plaintiff*